702 So.2d 1140 (1997)
Richard Charles BAKER, Plaintiff-Appellant,
v.
Linda M. FREEMAN, et al., Defendants-Appellees.
No. 97-604.
Court of Appeal of Louisiana, Third Circuit.
October 29, 1997.
Writ Denied December 10, 1997.
*1141 Randal Lee Menard, Lafayette, for Richard Charles Baker.
Preston D. Cloyd, Lafayette, for Linda M. Freeman, et al.
Before SAUNDERS, PETERS and AMY, JJ.
AMY, Judge.
This appeal involves injuries allegedly received by the plaintiff, Richard Charles Baker, as the result of a rear-end automobile collision. The jury found in favor of the plaintiff and awarded general damages, past and future medical expenses, and future lost wages. The plaintiff now appeals seeking an increase in the amount of the award.

DISCUSSION OF THE RECORD
The record reveals that the May 16, 1994 accident at issue in this case occurred in mid-day traffic on Johnston Street in Lafayette, Louisiana. The plaintiff, Richard Charles Baker, testified that he was traveling that day in a tow truck owned by his business, Rick's Towing Service. He stated that he was stopped at a red light when he was struck from behind.
*1142 The defendant, Linda M. Freeman, testified that, prior to the accident, she had attended a teacher's workshop and was southbound on Johnston Street in order to, first, find something for lunch and then head for a bookstore to purchase material related to the workshop. She stated that it was raining heavily and that when she applied the brakes of her Jeep Cherokee, the vehicle "began to skid like [she] was on a sheet of ice." Despite her attempts to stop the vehicle, she hit the back of the plaintiff's tow truck. She stated that before she applied the brakes she was traveling at approximately thirty to thirty-five miles per hour. Mrs. Freeman testified that, after she applied the brakes, she slowed down to approximately ten to fifteen miles per hour.
When Mr. Baker was asked to describe the impact, he testified that: "It jolted me pretty good in the cab. I had a seat belt on and my head snapped back and hit the back glass, hit the back of the seat, hit the glass. A pretty good impact." He said that following this impact, he sat in the truck for approximately a minute and then got out of the truck to check on the defendant. Although the defendant testified that Mr. Baker informed her that he was not hurt, the plaintiff testified that he informed the reporting police officer that he was experiencing pain in his back, neck, and right shoulder. When asked at trial to describe these sensations, the plaintiff testified to the following: "I had some sharp pains in my lower neck, my lower back. It started burning real bad. That's what scared me the most, I guess. It started burning."
The record indicates that the plaintiff was transported by ambulance to Our Lady of Lourdes Hospital where he was examined. The hospital records indicate that he was given medication, ice packs, and an arm sling. He was also advised to rest in bed at home. Further, he was advised to seek a follow-up examination from his family physician, Dr. Pat Sonnier. However, the plaintiff testified that, although his pain continued, he was unable to get an appointment with Dr. Sonnier.
After seeking advice from his attorney, the plaintiff was referred to Dr. Edwin Moise, a dentist. In a letter to the plaintiff's attorney, Dr. Moise indicates that he initially saw the plaintiff on June 7, 1994 and examined him for a "possible temporomandibular joint dysfunction problem." On that date, Dr. Moise prescribed medication and told the plaintiff to return in two weeks. After missing one scheduled appointment, the plaintiff eventually returned for a reevaluation. Dr. Moise noted that the plaintiff continued to complain of headaches, but that "[a]n evaluation of his temporomandibular joints revealed that he had no problems whatsoever with no capsulitis or retrodiscitis present." Dr. Moise then noted that the plaintiff had an appointment with Dr. John Cobb and that following Dr. Cobb's evaluation and treatment, he would be happy to see him again for treatment of tinnitus.
The record indicates that Mr. Baker did, in fact, see Dr. Cobb, an orthopaedic surgeon. Dr. Cobb testified by deposition and stated that he first saw the plaintiff on July 27, 1994. He stated that Mr. Baker related the accident and then listed severe headaches and ringing in the ears as complaints. Mr. Baker also reported "aching in both shoulder blades all the way down to his lower back. Numbness in his elbows at times and into his forearms; numbness into his buttocks....." Dr. Cobb then stated that the plaintiff told him he had difficulty staying seated, rising from a seated position and, further, that doing paper work aggravated his condition. Mr. Baker also rated "his pain range from five to a nine on a scale of zero to ten, ten being the worst pain he's ever experienced." Upon initial examination, Dr. Cobb found spasm in the right trapezius muscle and levator scapula. He affirmed that his finding was consistent with the pain complained of by Mr. Baker.
Dr. Cobb stated that he took x-rays of the plaintiff and that, upon review, these tests revealed "a condition known as spondylolysis at L-5 bilaterally." With regard to this condition, Dr. Cobb stated the following: "There was no instability or slippage noted on the x-ray. What a spondylolysis is is a defect in the area of the bone called the pars interarticularis. That's the area between the joints. In this case, it's the area where the backbone *1143 connects to the pelvic bone. So, his bone is missing. This is a developmental condition; it was not caused by this accident." Dr. Cobb further affirmed that it is possible for a person to have this condition without pain and then the condition become symptomatic as a result of trauma. He opined that Mr. Baker's condition became symptomatic as a result of the accident of May 16, 1994. With regard to treatment of the condition, Dr. Cobb stated that physical therapy, medication, and activity modification may control the pain but that if the pain becomes unacceptable a fusion of the level of the defects can be performed. Following this examination, Dr. Cobb recommended a cervical and lumbar MRI.
Dr. Cobb testified that he next saw the plaintiff on September 21, 1994 and that the plaintiff's pain continued. He also testified that he reviewed the results of the MRI and that they revealed "significant degeneration" at L-5, spondylolysis as detected by x-rays taken at Mr. Baker's first visit, and spondylosis at the C4-5 level. With regard to the spondylosis, Dr. Cobb testified that it "is a term used to describe degeneration of the spine and all of the adaptive changes noted on the x-rays." He opined that it is "a developmental condition represented by stress fractures usually in the adolescent years." Dr. Cobb further affirmed that it was his understanding that this condition had been asymptomatic before the accident but became symptomatic afterwards. With regard to treatment for these conditions, Dr. Cobb prescribed physical therapy for both the lumbar and cervical problems. He further advised the plaintiff that, if the pain did not reach an acceptable level, the spondylolysis could be treated with surgery, namely lumbar decompression and fusion.
The record indicates that the plaintiff followed Dr. Cobb's recommendation and sought physical therapy. The records of The Center for Functional Excellence indicate that the plaintiff's first visit for therapy was on October 14, 1994. However, a discharge summary, found in the center's records, indicates that the plaintiff visited the therapist on only seven occasions and was finally discharged by the clinic for non-attendance. The plaintiff testified that his initial visits provided temporary relief, but that he stopped going after it no longer provided relief.
Dr. Cobb testified that the plaintiff returned for a final visit on November 2, 1994 and that the conservative treatment was not reportedly providing relief. Dr. Cobb stated that Mr. Baker continued to complain of "fairly significant headaches." Dr. Cobb opined that these headaches were the result of occipital neuralgia. He referred the plaintiff to Dr. Robert Rivet, a neurologist for further examination. He also stated that he explained the available surgery and that Mr. Baker told him that he would be in touch when he was ready to proceed with it. However, as of the date of Dr. Cobb's deposition, no surgery had been scheduled. The plaintiff testified that he knew he would have to have the surgery eventually, but that he preferred to delay it as long as he could live with the pain.
With regard to the occipital neuralgia thought to be the basis of the plaintiff's headaches, Dr. Cobb explained that "[t]his is essentially pain running from the occipital area to the head, usually unilateral. It's associated with compression of the greater occipital nerve, so it's a unilateral headache from the back of the head, usually extending around the front top." A letter from Dr. Rivet addressed to Dr. Cobb was entered into evidence and indicates that the plaintiff saw Dr. Rivet on November 7, 1994 and that Dr. Rivet believed him to have "bilateral occipital neuralgia." Of that first visit with Dr. Rivet, the plaintiff testified that the doctor injected him with medication and that, temporarily, this medication lessened the pain. Although Dr. Rivet advised him to return if the pain came back, the plaintiff stated that he did not continue seeing Dr. Rivet.
At the request of State Farm Insurance, Mrs. Freeman's automobile insurer, the plaintiff visited another neurologist, Dr. Jack Hurst. Unlike Dr. Rivet, Dr. Hurst's report to State Farm indicates that following an examination and CT scan, he could not find the source of Mr. Baker's focal pain. He opined that the plaintiff did not require "neurosurgical *1144 service." He did, however, note that the CT scan identified changes within the plaintiff's sinuses and advised that he see an ear, nose, and throat doctor for help with this problem. He stated that he thought these problems could be cleared with antibiotics and antihistamines. The plaintiff testified that following this recommendation, he visited Dr. Bradley Chastant. The plaintiff testified that Dr. Chastant performed an examination, an allergy test, and, ultimately, prescribed nasal spray and "a sinus tablet."
Following these examinations and evaluations, the plaintiff filed a Petition for Damages on April 25, 1995. He alleged that the automobile accident was the result of the sole fault and negligence of Mrs. Freeman. State Farm was also named as a defendant as the insurance provider for Mrs. Freeman. He sought general damages, medical expenses, loss of earnings, loss of earning capacity, and damage related to his vehicle.
Following a jury trial, the trial court found in favor of the plaintiff. The jury awarded the following damages: (1) $12,000.00 in general damages; (2) $6,500.00 for future lost wages; (3) $7,407.13 for past medical expenses; and (4) $40,000.00 for future medical expenses. The jury denied any damages for past lost wages. The plaintiff filed a Rule for Additur alleging that the verdict was "inadequate and inconsistent with regard to future medical expenses and general damages." In his memorandum in support of the rule, the plaintiff alleges that the jury's award of $40,000.00 for future medical expenses indicates that the jury accepted Dr. Cobb's opinion that the plaintiff would require surgery. He notes that Dr. Cobb testified that the surgery would cost $45,000.00. Given this finding, he argues that the jury erred in awarding only $12,000.00 in general damages for an injury requiring this type of surgery. The trial court denied the Rule for Additur.
The plaintiff now appeals and argues that the jury erred in awarding inadequate amounts for general damages, future medical damages, and future lost wages. The plaintiff also maintains that the jury erred in denying past lost wages. Although the defendants argue, in brief, that the plaintiff failed to prove that he suffered any damages as a result of the accident and, therefore, the jury's verdict should be reversed, we find no answer to the appeal in the record. For the following reasons, we affirm and amend.

LAW

General Damages
The plaintiff alleges in this first assignment of error that the jury erred in awarding inadequate general damages in view of their award of $40,000.00 for future medical expenses. As in his Rule for Additur, the plaintiff argues that the award for future medicals indicates that the jury found that the plaintiff is entitled to the surgery recommended by Dr. Cobb. Because of the nature of the surgery and the plaintiff's complaints of headaches and neck and back pain, the plaintiff argues that the $12,000.00 awarded by the jury is abusively low. In support of this argument, the plaintiff points to the curtailment of his ability to engage in recreational activities as well as the plaintiff's inability to interact with his son as he might have previously.
The defendants maintain that the jury's award of general damages was appropriate given evidence that any injuries suffered by the plaintiff were minimal. In particular, the defendant argues that the quantum should not be raised as the plaintiff has not sought treatment from Dr. Cobb since his examination on November 2, 1994 and, further, that he has been able to continue working at light to moderate activity and has been able to continue activities such as participation as a local volunteer firefighter.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), the Louisiana Supreme Court discussed the standard an appellate court must apply when reviewing the award of general damages by a lower court. After reaffirming an earlier court discussion of the standard of review in Reck v. Stevens, 373 So.2d 498 (La.1979), the court stated the following:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for *1145 disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn, 623 So.2d at 1261.
With the damages awarded in this case, particularly the medical expenses, the jury apparently accepted Dr. Cobb's testimony that the plaintiff's symptoms were caused by the automobile accident and that the surgery recommended by Dr. Cobb was required. In light of these factual findings by the jury regarding causation, we must now review the record to determine if the $12,000.00 awarded in general damages is a clear abuse of the jury's discretion. The plaintiff's testimony indicates that he began to complain of pain at the time he was taken from the accident scene in an ambulance and that these complaints continued until the time of trial. As previously stated, Dr. Cobb concluded that these complaints were related to the accident and, as conservative treatment had failed, surgery is the plaintiff's only alternative.
As described by Dr. Cobb, the lumbar surgery would require four to five days of hospitalization and an additional four to six months before the plaintiff could return to work. However, full rehabilitation would not occur for approximately one year post-surgery. Additionally, he would be restricted to light to medium work for the remainder of his life.
The plaintiff testified that he knew that he would have to have this surgery, but that he wanted to wait. When asked when he thought he might proceed, the plaintiff responded as follows: "As long as I can suck the pain because I don't want nobody cutting on me if I don't have to. But I needI have to assure myself that eventually I will have to have it done." He also testified to the following with regard to the pain he experienced in his back:
Q. How about yourwe talked about your head and your neck pains that you're still having and how often you have them. How about your back pains you were talking about earlier?
A. Again, if Imy lower back pain, that'sI can't lift anything. I can'tthey startI mean, they're in the base of my back, lower back. I can't lift anything. And then what I do lift, I have to be very careful of what I'm lifting, lift up with my legs and not my back. And my back hurts constantly. When I sit down, if I get up, I mean, it takes me a minute or so to get to where I canyou know, where I feel comfortable. If I sit in a chair or in an automobile, I can't stay in an automobile very long or in a chair very long because my right leg will go numb. If you would, the cheeks of my behind will get numb.
Q. How often does that occur, Ricky?
A. Every day. I can't sitI can't stay I can't sit still very long because it'll start pushing that pain up through the back of my neck.
Q. You talked about a complaint of shoulder pain earlier. Has that resolved?
A. No.
Q. How often do you get that?
A. The shoulder pain is not as badnot as often as the rest of it. It just depends. It just depends. It depends on what the weather is. It depends how I sleep. It depends what I'm doing or it dependsit just varies. The shoulder pain varies. The rest of the stuff doesn't vary. It stays the same all the time.
Q. Prior to the automobile accident of May 16th, 1994, had you ever experienced the pains you were talking about today?
A. No.
*1146 The plaintiff additionally stated that, as time passes, the pain has worsened.
Further, Oliver Smith, Jr., who stated that he had been employed by the plaintiff for approximately eighteen years, testified that the plaintiff had not complained of problems prior to the accident, but that his behavior has now changed. Mr. Smith stated that he often had to "furnish him a lot of Tylenol..." and that he had seen tears in the plaintiff's eyes due to the pain. He also testified to the plaintiff's limited working ability.
Further, the plaintiff stated that, not only had his injuries caused pain, but that he could no longer engage in recreational activities as he once had. The plaintiff stated the following:
I used to be pretty active in sports. I've pretty much done away with all of that. I don't play softball. I don't play football. I don't play basketball. I can't. I don't ride my horse near as much as I used to. I don't SCUBA dive. I tried to do some water skiing and stuff, but I can't. Most of my fun things that I do are pretty rough and tough stuff. And I can't do them anymore. I've just had to eliminate doing them all together. I don't hunt anymore. I don'tI can'tit's too uncomfortable to do it.
He also testified that he can no longer play with his young son as he might like and could not pick him up or carry him for a long period of time. This hindrance in his relationship with his son was confirmed by the plaintiff's girlfriend, Glenda LeBlanc.
After reviewing the above described injuries and the particular impact the injuries had upon the plaintiff, we conclude that the jury abused its discretion in awarding only $12,000.00 in general damages. We therefore consider prior awards to determine the lowest award that was within the jury's discretion. Youn, 623 So.2d 1257.
After review of the jurisprudence involving injuries and surgeries similar to those in the instant matter, we conclude that $50,000.00 is the lowest general damages award reasonably within the jury's discretion. See Carey v. Thomas, 603 So.2d 263 (La.App. 5 Cir. 1992)($50,000.00 award for cervical disc bulge and possible future surgery). Accordingly, we raise the award for general damages to $50,000.00
We note that the plaintiff urges a separate award for the occipital neuralgia condition diagnosed by Dr. Rivet. However, we do not conclude that a separate award is required in the instant matter as the defendant presented the report of Dr. Hurst wherein he found no such condition. Neither was there a diagnosis of TMJ. Given the unknown origin of the headaches and the absence of indication from the jury that a separate award was made for this condition, we do not amend the award to include separate damages for this condition.

Future Medical Expenses
The plaintiff next argues that the jury erred in awarding only $40,000.00 for future medical expenses. He maintains that, since there was no testimony regarding any other type of medical treatment or expenses, the jury must have found that he was entitled to the surgery recommended by Dr. Cobb. However, Dr. Cobb testified that the lumbar decompression and fusion would cost approximately $45,000.00 to $50,000.00. The defendants maintain that the plaintiff did not prove that surgery would be required and, further, the plaintiff did not fully attempt more conservative treatment. Accordingly, the defendants argue that this court should not only refuse to raise the quantum, but that this court should reverse the entire award. However, this court will not consider the defendants' request to reverse this award as we are unable to locate in the record, any appeal by the defendants.
This court has previously discussed the award of future medical expenses. In Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5 (La.App. 3 Cir.1991), the court held the following:
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. Boothe v. New Orleans Public Service, Inc., 447 So.2d 620 *1147 (La.App. 4th Cir.1984); Sikes v. McLean Trucking Co., 383 So.2d 111 (La.App. 3d Cir.1980). An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award. Simmons v. Custom-Bilt Cabinet & Supply Co., 509 So.2d 663 (La. App. 3d Cir.1987); Sikes, supra.
Id. at 8.
With regard to the costs of the lumbar decompression and fusion sought by the plaintiff, Dr. Cobb testified to the following:
Q Doctor, if you were to perform the decompression you talked about and the fusion, can you tell us what your charges would be for that, Doctor?
A Probably be twentytwenty some-odd thousand.
Q Just for your charges?
A Right.
Q And that would not include the hospital?
A The hospital would probably be another twenty-five thousand, something like this, twenty-five, thirty.
Dr. Cobb further testified that, following this type of surgery, he sometimes prescribes several weeks of physical therapy for the patient. However, there is no indication that therapy would be required in the instant matter. Additionally, there was no estimate given as to what such therapy would cost.
We conclude that the lumbar decompression and fusion surgery is the only future medical expense for which the jury could have made such an award. However, the $40,000.00 is below the range given by Dr. Cobb. As his testimony is the only evidence contained in the record as to the cost of surgery, it was error for the jury to not award the full cost of that procedure. Accordingly, we amend the jury's award for future medical expenses to $45,000.00.

Past Lost Wages
The plaintiff also maintains that the jury erred in not awarding past lost wages. He suggests that, although he was able to continue working, he could only do so in a restricted capacity. He argues that prior to the accident, he did much of the mechanical work for his towing company. However, after the accident, he was unable to do many of the mechanical repairs because of his physical limitations and, eventually, he was required to hire a full-time mechanic at work. The plaintiff now argues that he should have been reimbursed for the $500.00 per week salary of the newly hired mechanic.
While recovery for lost wages may be available, it is the plaintiff's burden to prove that he has suffered a loss of income. Bushnell v. St. Patrick Hosp., 594 So.2d 957 (La. App. 3 Cir.1992).
The only evidence regarding the hiring and related expense of the newly acquired mechanic is the plaintiff's own testimony and that of one of his employees. No physical evidence such as bank stubs or payroll receipts was entered into evidence. Furthermore, the plaintiff's tax forms indicate that not only was there no decrease in his salary, but that his business had afforded him a raise after the accident. While additional or more specific evidence may not have been a necessity for such an award, we do not conclude, given the lack of specificity of the evidence, that the jury was required to conclude that the plaintiff had either an actual loss of wages or that he had proven that loss. Accordingly, this assignment is without merit.

Future Lost Wages
Finally, the plaintiff asserts that the jury erred in awarding only $6,500.00 for future lost wages. He maintains that this sum is inadequate as he will be restricted to light to medium duty work for the remainder of his life and, additionally, he will have to continue paying the salary of the newly acquired mechanic.
In Hobgood v. Aucoin, 574 So.2d 344 (La.1990), the Louisiana Supreme Court held the following with regard to loss of earning capacity:
In Folse v. Fakouri, 371 So.2d 1120 (La. 1979), this court recognized that in determining an award for loss of earnings and earning capacity, what the plaintiff earned before and after the injury does not constitute *1148 the measure. While plaintiff's earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
Id. at 346.
The plaintiff in the instant matter earned his living as the owner of Rick's Towing Service, not as a mechanic. While the plaintiff testified that he performed seventy-five to eighty percent of the mechanical work for his company prior to the accident, the record indicates that he earned his living as a business owner, rather than as a mechanic. When asked to describe what his business and occupation entails, he testified as follows:
I handle all administrative office duties. I have a secretary who works in the office. I handle finances. I handleeverything administratively in the office has to go through me. Finances go through me. I drive at times. I don't drive as much as I used to, but I drive at times. I used to do mechanic work, service work, bid jobs, go on jobs.
Further, when asked about his role as the company mechanic, the plaintiff responded:
I did all the work on our own trucks, you know, what I could do myself, the things that I could do myself. Things that I couldn't do, that I had no knowledge of or things that I couldn't handle, I subbed out and sent out to outside repair shops. But I took care of all of that myself, did everything myself.
There is no indication in the record whether the repairs previously sent outside are now performed by the full-time mechanic or still performed by an outside source. Given this lack of specificity with regard to actual loss, we decline to find that the jury erred in not awarding damages for this new expense. Although the plaintiff may have previously contributed his skills as a mechanic to the business, there is no indication that the plaintiff's ability to function as a business owner has been affected. Further, he testified that he paid himself a salary from that business and, in fact, had given himself a raise after the accident.
Additionally, the jury awarded the plaintiff $6,500.00 for future lost wages. The plaintiff testified that he earned approximately $1,500.00 per month. Dr. Cobb testified that the plaintiff would be unable to return to work for four to six months following the surgery. Apparently, the jury determined that the plaintiff would be able to return to work four months after the surgery and, as such, determined that four months of compensation was adequate compensation. We find no reason to reverse that finding of fact. In view of this award and the plaintiff's ability to continue his work as a business owner, we conclude that the jury's award was not erroneously low.

DECREE
For the foregoing reasons, the decision of the trial court is affirmed as amended. All costs of this proceeding are assessed to the defendants, Linda Freeman and State Farm Mutual Automobile Insurance Company.
AFFIRMED IN PART; AMENDED IN PART; AND RENDERED.